## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL INDICTMENT NO.** |
| **v.** | : | **1:11-CR-557-AT-AJB** |
| | : | |
| **HAMZA BENDELLADJ,** | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court are Defendant Hamza Bendelladj's motions to suppress evidence, [Doc. 108], and to dismiss the indictment, [Doc. 109].  For the following reasons, the undersigned **RECOMMENDS** that both motions be **DENIED**.

### *1.    Motion to dismiss, [Doc. 109]*

Since granting Defendant's motion to dismiss would be dispositive of this case, the Court addresses that motion first.  Bendelladj argues that the indictment is defective because venue is improper in this District.  He argues that none of the conduct with which he is charged occurred in the Northern District of Georgia.  [Doc. 109 at 2].  He argues that the government's sole venue allegation is contained in ¶ 17 of the indictment, which alleges that one of Bendelladj's computer servers was located in this District and that between February 21 and 24, 2011, the server showed "GET requests"

to malware-infected computers ("bots"). [*Id.* at 3 [quoting Doc. 4 at 5]]. Bendelladj alleges that there is no evidence from review of the discovery that the server responded or otherwise sent outgoing messages. [*Id.*]. He further alleges that his computer expert has reported finding on the server none of the malware with which Bendelladj is charged with using. [*Id.* at 3-4]. As a result, he seeks dismissal of the instant indictment.

The motion is due to be denied. As pointed out at the most recent pretrial conference, *United States v. Snipes*, 611 F.3d 855, 865-67 (11th Cir. 2010), is the most recent in a line of decisions that hold invalid a pretrial challenge on venue grounds against a facially sufficient indictment that contains a clear statement of venue. *Snipes* and the cases before it instead hold that whether venue is proper in a criminal case is a matter for the jury to decide. *Id.* at 867.

" 'On its face, an indictment alleges proper venue if it alleges facts which, if proven, would sustain venue in the district alleged." *United States v. Delgado-Nunez*, 295 F.3d 494, 499 n.12 (5th Cir. 2002) (quoting *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1060 (9th Cir. 2000)); *see also United States v. Bohle*, 445 F.2d 54. 59 (7th Cir. 1971) ("An indictment alleges proper venue when it alleges facts which, if proven, would sustain venue."), *overruled on other grounds United States v. Lawson*,

2

653 F.2d 299 (7th Cir. 1981).  In this case, there is a clear statement of facts pertaining to venue, which, if proven, would be sufficient to establish that venue was in this District.  [Doc. 4, ¶¶ 1, 17, 20, 21, 23, 28 and 29].

As a result, the undersigned **RECOMMENDS** that Bendelladj's motion to dismiss the indictment, [Doc. 109], be **DENIED**.

### 2.    *Motion to suppress, [Doc. 108]*

Bendalladj challenges the February 25, 2011 search warrant which authorized a search for

> Information associated with IP Address 75.127.109.16 and the domain name 100myr.com that is stored at premises owned, maintained, controlled, or operated by Global Net Access, LLC, a company headquartered at 1100 White St. S.W. Atlanta, Georgia, 20210.

[Doc. 108 at 1 (quoting *In the Matter of the Search of Information associated with IP Address 75.127.109.16*, No. 1:11-MJ-0246-ECS (N.D. Ga. Feb. 25, 2011) (hereinafter "*In re IP Address*")].

### a.    *The application for the warrant*

In support of the application for the search warrant, the affiant, FBI Special Agent Mark C. Ray, recounted his training and experience in the computer crimes area, including both law enforcement training and experience and private industry.  *In re IP*

3

*Address* ¶¶ 3-4.  He defined technical terms such as "server," "IP address," "domain name," "bot and botnet,"[1] "Banking Trojan,"[2] "keynote logging,"[3] "form grabbing,"[4] and "malware."[5]  *Id.*  ¶ 6.  He then alleged that in December 2009, a new malware toolkit called SpyEye v1.0 appeared for sale on Russian underground online forums.

---

[1]      The affidavit defined "bot" and "bot net" as a computer that contains a software program that interacts with network services intended for people as if it were a person.  "There are both illegal and legal uses for bots; in this instance, however, a bot is malicious in that it has been illegally infected with malicious computer software."  *In re IP Address* ¶ 6.E.  It further explained that a collection of bots forms a botnet, and that the malicious software associated with a particular botnet allows infected computers to be remotely controlled by a master computer commonly referred to as a "command and control" ("C&C") server.  *Id.*

[2]      A "Banking Trojan" is malicious software that infects computers that facilitates unauthorized access of the computer user's or financial institution's private credentials and financial information.  *In re IP Address* ¶ 6.F.

[3]      "Keynote logging" is the action of tracking (or logging) the keys struck on a keyboard, typically in a covert manner so that the person using the keyboard is unaware that the actions are monitored.  *In re IP Address* ¶ 6.G.

[4]      "Form grabbing," when associated with malicious software, is a method of capturing a victim user's data directly from "web forms" located within the Internet browser that the user is using, which typically includes login information and password fields.  *In re IP Address* ¶ 6.H.

[5]      "Malware" is a class of software that is designed to automate online criminal activities such as installation of keystroke loggers, remote system access and proxying of computer network traffic.  A proxy server is a server that acts as an intermediary or "go between" for Internet requests sent from one computer to another, and are often used by malware operators to conceal their true location.  *In re IP Address* ¶¶ 6.I & 6.J.

4

*Id.* ¶ 7. Investigation revealed "Gribodemon" to be SpyEye's creator. *Id.* ¶ 8. The affiant concluded that SpyEye was similar to another malware called Zeus Banking Trojan, in that each used keystroke logging and form grabbing techniques designed to steal financial and personally identifying information from unsuspecting computer users. *Id.* ¶ 9. The affidavit then recounted that the creator of Zeus Banking Trojan announced that he intended to hand over the source code for Zeus to Gribodemon, who indicated on online criminal forums that he intended to combine Zeus and SpyEye into a larger more malicious malware toolkit. *Id.* The affidavit then explained that thereafter a combined malware, SpyEye v1.3.05, was released. *Id*.

The affidavit continued that a SpyEye Command and Control ("C&C") server is a computer system administered by one or more individuals that is used remotely to send commands to the victim computers (bots) under its control. *Id.* ¶ 10. The affidavit related that several SpyEye C&C servers had been identified worldwide by their IP addresses, including one previously operating in this District and another which was currently active in this District and the subject of the search warrant application. *Id.* ¶ 16. The affiant stated, beginning at *id.* ¶ 17, that there are several websites available in the malware research industry designed to locate computers or

5

servers connected to the Internet that are infected with or operating malware and botnets.

> Specifically, the website called SpyEye Tracker (https://spyeyetracker.abuse.ch) identified SpyEye C&C servers worldwide, by searching for and locating files on computer systems that are uniquely associated with SpyEye. SpyEye Tracker was developed by the Swiss internet security research firm Abuse.ch. Abuse.ch developed the well known Zeus Tracker website (https://zeustracker.abuse.ch). I have learned through discussions with members of the internet security industry and law enforcement that the Zeus Tracker website is utilized by corporations and law enforcement agencies worldwide for identifying Zeus C&C servers. In addition, I have learned from these discussions that many information security organizations and law enforcement agencies around the world recognize SpyEye Tracker as a reliable source of identifying SpyEye C&C servers. I am not aware of any instances in which SpyEye Tracker has misidentified a particular IP address as hosting a SpyEye C&C server.

> 18. On December 16, 2010, I obtained a similar search warrant for another suspected SpyEye C&C server hosted by a company in Omaha, Nebraska. The affidavit I submitted in support of the search warrant application relied, in part, on the fact that the suspected SpyEye C&C server had been identified as such on SpyEye Tracker.[] On January 26, 2011, I obtained three other search warrants for suspected SpyEye C&C servers hosted by companies in Orlando, Florida, Kansas City, Missouri, and New York, New York. The affidavits I submitted in support of those search warrant applications also relied, in part, on the fact that the suspected SpyEye C&C servers had been identified as such on SpyEye Tracker.[] The information obtained pursuant to all four search warrants confirmed that the suspected SpyEye C&C servers were, in fact, SpyEye C&C servers; thus, supporting the reliability of SpyEye Tracker in identifying SpyEye C&C servers.

6

19.  Based on my training and experience, I know that malware research websites such as SpyEye Tracker use various methods for identifying and labeling servers connected to the internet as SpyEye C&C servers.  For example, one common method is setting up a computer as a "honey pot." A honey pot in the malware research field is a computer that is connected to the internet with the intention of becoming infected with malware such as SpyEye.  The computer is intentionally left in a vulnerable state (that is, no anti-virus protection) so that the person who establishes the honey pot can identify the source of the virus such as a SpyEye C&C server once the computer becomes infected.  This is done by capturing the IP Addresses associated with distributing and operating the malware.  While I do not know the specific method SpyEye Tracker uses to identify any specific server as a SpyEye C&C server, based on my training and experience, I believe that the various methods of which I am aware are reliable.

20.  On February 17, 2011, at 11:23 p.m., I reviewed the SpyEye Tracker website.  The following information was observed:

| SpyEye C&C | IP address | Level | Status | Files Online | Country | AS number |
|---|---|---|---|---|---|---|
| 100myr.com | 75.127.109.16 | 4 | online | 2 | USA | AS16626 |

This information indicates that the server with IP address 75.127.109.16, utilizing the domain name 100myr.com, is being utilized as a SpyEye C&C server (see Exhibit A).[6]  This IP address is owned, maintained, controlled, or operated by Global Net Access LLC, a web hosting company headquartered at 1100 White St, SW, Atlanta, Georgia 30310. SpyEye Tracker is updated on a daily basis, thus I have reason to believe that malicious code is still on this server.

---

[6]     Exhibit A was a screenshot of the SpyEye Tracker website search for IP address 75.127.109.16.  Although the copy of the warrant submitted is not very readable, the image reflects "Hits in Host table: 1," while there were no results in the ConfigURL, BinaryURL and DropURL tables.  *In re IP Address* at 25.

7

*Id.* ¶¶ 17-20 (footnotes omitted).  The affidavit also related that the suspected Omaha SpyEye C&C server had been identified as such on another website, malwaredomainlist.com (http://www.malwaredomainlist.com), while the servers in this case and the ones in Orlando, Kansas City and New York had not been identified as such on malwaredomainlist.com.  *Id.* at 10 nn.2-3.

Finally–for purposes of this R&R–the affidavit provided that Global Net Access LLC is a business that maintains servers connected to the Internet and offers those servers for customers to use to operate websites, store and process information and perform other web-based activities.  It also stated that a provider such as Global Net Access gives customers, for a fee, access to its servers and often offers related services such as domain name registration and e-mail service.  *Id.* ¶ 24.

### b.    *Bendelladj's arguments*

Bendelladj alleges that the primary source of the information in the warrant application is from a website called Abuse.ch, which Bendelladj likens to a confidential informant.  He argues that in effect Abuse.ch is just a blog, that is, an unfiltered personal internet account, with no identifiable contributor.  Bendelladj submits that the unknown contributor associated with Abuse.ch lists IP addresses asserted to be malware, however, this information has not been shown to have been vetted, cannot be

AO 72A
(Rev.8/8
2)

verified nor can it be recreated since Abuse.ch does not maintain an archive.  In addition, he alleges that although this website is associated with the "Swiss Information Security Research Association" and "Bernet Monika," the only cross-reference to this information is the website itself.  [Doc. 108 at 2-3].  Bendelladj also points out that the affiant conceded that he was unaware of the methodology Abuse.ch used to obtain the IP addresses it puts on the suspected malware list, and argues therefore that the website's reliability or accuracy cannot be checked.  He also argues that the bald statement that Abuse.ch is relied upon by security organizations and law enforcement agencies around the world is not sufficient, since these entities are not identified.  [*Id.* at 3].

Bendelladj next argues that the supporting affidavit's acknowledgment that the suspected malware in this case, SpyEye C&C, did not show up on another respected cyber-security website, www.malwaredomainlist.com, is another reason to suspect Abuse.ch's reliability.  [*Id.* at 4].  Finally, he argues that the Abuse.ch webpage screenshot attached to the affidavit shows "no results" for linking 100myr.com to the Atlanta-based IP address.  [*Id.*].

9

### c.    Discussion

Bendelladj's motion to suppress fails for two reasons.  First, he has not established that he has a legitimate expectation of privacy in the IP address 75.127.109.16, the domain name 100myr.com, nor in Global Net Access, LLC, the premises searched.  To challenge a seizure as violating the Fourth Amendment, a defendant must have "standing,"[7] *i.e.*, a legitimate expectation of privacy in the premises.  *See United States v. Gonzalez*, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991).  As a result, the Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion.  *See Katz v. United States*, 389 U.S. 347, 353 (1967).  Fourth Amendment rights are personal, and only individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search.  *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000).

---

[7]    The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing."  *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982).  However, the undersigned will use the word "standing" when referring to whether the defendant has an expectation of privacy because the parties have used this term and courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

One's standing to challenge governmental actions on Fourth Amendment grounds is a threshold question. *United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988). To have standing, the defendant bears the burden of showing a legitimate expectation of privacy in the area searched. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008); *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997).

An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *Harris*, 526 F.3d at 1338. That is, a defendant must establish both a subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995). The subjective prong is a factual inquiry, *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987), *United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. June 22, 2006); and "requires that a person exhibit an actual expectation of privacy." *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286). The objective prong is a question of law, *McKennon*, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable," *King*, 509 F.3d at 1341 (quoting *Segura-Baltazar*, 448 F.3d at 1286).

11

Courts assess on a case-by-case basis the "standing" of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control.  *Oliver v. United States,* 466 U.S. 170, 191 n.13 (1984). No one circumstance is talismanic to this inquiry.  *United States v. Haydel*, 649 F.2d 1152, 1154 (5th Cir. Unit A Jul. 8, 1981)[8]; *see also Rakas*, 439 U.S. at 152 (stating that the legitimacy of one's privacy claim is determined by totality of the circumstances) (Powell, J., concurring). "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . .  [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92 (1980) (citation omitted).  Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises.  *United States v. Pitt*, 717 F.2d 1334,

---

[8]     The Eleventh Circuit has adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, rendered prior to October 1, 1981.  *See United States v. Todd*,  108 F.3d 1329, 1333 n.5 (11th Cir. 1997); *Limelight Productions, Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11th Cir. 1995).

AO 72A
(Rev.8/8
2)

1337 (11th Cir. 1983); *Haydel*, 649 F.2d at 1154-55. "The essence of this inquiry is whether the defendant has 'demonstrate[d] a significant and current interest' in the property at the time it was searched." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012) (Batten, J.) (quoting *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir.1984)). To have an expectation of privacy in premises that he did not own or lease, a defendant  must show " 'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.' " *Id.* (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)); *see also United States v. Chaves*, 169 F.3d 687, 690-91 (11th Cir. 1999) (same); *United States v. Bachner*, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983) (same); *Garcia*, 741 F.2d at 366 (holding that although appellant had more than tenuous interest in searched apartment, appellant had no standing where connections were not regular or personal enough to find that appellant adopted apartment as a place of business or as a residence). *Compare United States v. Torres*, 705 F.2d 1287, 1294-95 (11th Cir. 1983), *vacated en banc, consideration pending remand to panel*, 718 F.2d 998 (11th Cir. 1983), *remanded*, 720 F.2d 1506 (11th Cir. 1983), *on appeal after remand*, 741 F.2d 1323 (11th Cir. 1984) (where appellants were house guests of searched house, ate, slept and showered there, stored

AO 72A
(Rev.8/8
2)

personal belongings there and were the only guests in house at time of search, appellants would have standing to challenge search).

A court may deny a motion to suppress where there is "[n]o allegation of ownership or other legitimate expectation of privacy." *United States v. Richardson*, 764 F.2d 1514, 1526 (11th Cir. 1985). Also, a hearing is not necessary "where a defendant in a motion to suppress fails to allege facts that, if proved, would require the grant of relief." *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984). Thus, "courts must determine whether a defendant has established standing to bring the motion to suppress by sufficiently alleging that he possessed a reasonable expectation of privacy in the area searched." *United States v. Thompson*, 171 Fed. Appx. 823, 827-28 (11th Cir. Mar. 27, 2006). This does not mean that a defendant must append a separate signed statement if a motion or brief signed by the defendant's attorney sufficiently alleges standing. *United States v. Ford*, 34 F.3d 992, 994-95 (11th Cir. 1994). Also, the Eleventh Circuit has allowed a defendant to rely on testimony or an inventory prepared by the government identifying property as

14

belonging to the defendant.   *United States v. Eyster*, 948 F.2d 1196, 1209 (11ᵗʰ Cir. 1991).⁹

However, a defendant may not establish standing by relying on the government's theory of the case.  *United States v. Singleton*, 987 F.2d 1444, 1449 (9ᵗʰ Cir. 1993); *United States v. McNeal*, 82 F. Supp. 2d 945, 950 (S.D. Ind. 2000); *see also Thompson*, 171 Fed. Appx. at 828 (concluding that motion to suppress relying on government contention that room was rented by defendant was insufficient to demonstrate standing to warrant an evidentiary hearing); *United States v. Henry*, No. 1:09-cr-522, 2010 WL 5559207, *4 (N.D. Ga. Dec. 7, 2010) (R&R *adopted by* 2011 WL 65762 (Jan. 7, 2011)) ("The Government correctly contends that Defendant cannot show standing simply through the contentions of Government agents or the theory of the Government's case.") (citing *United States v. Zermeno*, 66 F.3d 1058, 1062

_____

⁹     The undersigned notes that the Seventh Circuit provides a defendant less leeway.  That Court has held that a defendant may not establish a subjective expectation of privacy by relying on facts in a search warrant affidavit or testimony from a government witness because "without an affidavit or testimony from the defendant it is almost impossible to find a privacy interest because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent."  *See United States v. Ruth*, 65 F.3d 599, 604-05 (7ᵗʰ Cir. 1995).  The Eleventh Circuit on the other hand has suggested that under proper circumstances, a warrant affidavit might provide evidence of standing.  *See Thompson*, 171 Fed. Appx. at 828 (indicating under circumstances of the case that warrant affidavit did not establish standing).

15

(9th Cir. 1995)).  Also, a defendant cannot rely on general or conclusory assertions to establish standing.  *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000); *see also United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (holding that offer of conclusory statements was insufficient to establish standing); *United States v. Silouangkhoth*, No. 2:10-cr-821, 2011 WL 1549427, *2 (D. Utah Apr. 21, 2011) (finding that defendant did not establish standing where he made "a conclusory allegation that he has [ ] an interest in, or control over, the property").  Instead, the motion must be "definite, specific, detailed, and nonconjectural."  *Richardson*, 764 F.2d at 1527.  Where the motion to suppress is wholly lacking in sufficient factual allegations to establish standing, a court need not hold an evidentiary hearing based on a promise to prove standing at the hearing.  *Cooper*, 203 F.3d at 1285.

In this case, Bendelladj has not explained his relationship to either the subject IP address or domain name.  The search warrant application does not identify him either by name, screen name or alias.  The fact that the government presumably expects to prove Bendelladj's association with the IP address, domain name, or both, is insufficient to satisfy Bendelladj's burden to establish an expectation of privacy.

Moreover, the Supreme Court consistently has held that there is no legitimate expectation of privacy in information a person voluntarily reveals to third parties.

16

*United States v. Miller*, 425 U.S. 435, 442-43 (1976).  Here, even assuming that Bendelladj has an association with the IP address or domain name that were the subjects of the search,  the premises to be searched were servers belonging to a third party web hosting facility.   In this regard, warrants issued pursuant to 18 U.S.C. § 2703(a), such as in the present case, do not directly infringe upon the personal privacy of an individual, but instead compel a service provider to divulge records maintained by the provider for the subscriber.  *See United States v. Berkos*, 543 F.3d 392, 398 n.6 (7th Cir. 2008).

Second, even if Bendelladj had an expectation of privacy in the locations searched, the affidavit contained sufficient information to allow the issuing magistrate judge to determine whether the information from Abuse.ch was reliable and thus the warrant was supported by probable cause.  "Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) (per curiam); *see also United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (same).  "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*,

462 U.S. 213, 232 (1983).  To determine whether probable cause exists to issue a search warrant, the issuing magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* at 238.  An informant's veracity, reliability, and basis of knowledge are relevant considerations in determining whether probable cause existed under the totality of the circumstances, and a deficiency in one may be compensated for by a strong showing in another.  *Brundidge*, 170 F.3d at 1352-53. A warrant affidavit may be based on hearsay information, so long as the issuing magistrate judge was informed of (1) the underlying circumstances that the informant relied on to conclude that some criminal activity was taking, or had taken, place, and (2) some facts that established the probable credibility of the informant or the reliability of his information. *United States v. Hill*, 338 Fed. Appx. 855, 857-58 (11th Cir. July 23, 2009) (citing *United States v. Martin*, 615 F.2d 318, 323 (5th Cir. 1980)[10]).  The "totality-of-the-circumstances analysis . . . permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an

---

[10]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

18

informant's tip." *Gates*, 462 U.S. at 234.  An informant's tip, however, does not need to be subject to independent police corroboration in every case.  *Brundidge*, 170 F.3d at 1353.

In deciding whether to issue a search warrant, the issuing judge may rely upon the opinions and conclusions of an experienced law enforcement agent-affiant, *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995), since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer."  *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)).

The "question of what amounts to probable cause is purely a question of law." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992); *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) ("The question of what amounts to probable cause is purely a question of law. . . .") (citations and internal quotation marks omitted). When evaluating the propriety of a search warrant, a reviewing court must determine " 'whether the [issuing judge] had sufficient material before him to permit an independent judgment that there was probable cause to justify a search.' "  *United States  v. Lockett*, 533 Fed. Appx. 957, 965 (11th Cir. Aug. 28, 2013) (quoting *United States v. Viera*, 644 F.2d 509, 511 (5th Cir. Unit B 1981).  The task of a reviewing court

19

is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant. *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). Moreover, the reviewing court must afford great deference to a magistrate judge's determination of probable cause. *United States v. Steiger*, 318 F.3d 1039, 1046 (11th Cir. 2003); *Brundidge*, 170 F.3d at 1352. Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations. *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). As the Supreme Court has instructed, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734 (quoting *Ventresca,* 380 U.S. at 109). When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States*

*v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980); *see also United States v. Lockett*, 533 Fed. Appx. 957, 965 (11th Cir. Aug. 28, 2013) (same).

In this case, the issuing magistrate judge was justified in concluding that the information from Abuse.ch was reliable and thus probable cause existed to issue the search warrant. First, the affiant related that Abuse.ch was relied upon by other law enforcement officers (and private security organizations) in their efforts in detecting both Zeus Banking Trojan and SpyEye malware. Observations of fellow officers engaged in a common investigation are a reliable source for a warrant. *Ventresca*, 380 U.S. at 111; *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986); *see also United States v. Campbell*, 193 Fed. Appx. 921, 925 (11th Cir. Aug. 18, 2006). The fact that the law enforcement agencies were not identified does not render the information unreliable; after all, search warrants may be based upon information from anonymous lay informants. *See Brundidge*, 170 F.3d at 1352. What is critical is that the confidential information be reliable. In this case, it was.

The affiant asserted facts that corroborated the reliability of both Abuse.ch and the opinion of Abuse.ch's reliability held by the anonymous law enforcement agencies and private security organizations. First, the fact that Abuse.ch accurately identified IP addresses associated with the Zeus Banking Trojan makes it more likely that

21

Abuse.ch's listing of the subject IP address as SpyEye malware also was accurate. *See United States v. Morales*, 238 F.3d 952, 953 (8th Cir. 2001) ("Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence."); *United States v. Ridolf*, 76 F. Supp. 2d 1305, 1308-09 (M.D. Ala.1999) (recognizing that one way to test reliability and veracity is to examine the informant's "track record" of providing reliable information in the past).

Second, Agent Ray utilized Abuse.ch's information in support of search warrants for suspected SpyEye C&C servers in Omaha, Orlando, Kansas City and New York, and the information was shown to be reliable as these IP addresses were discovered to be SpyEye.

Third, it appears from the affidavit that Abuse.ch's SpyEye Tracker is just as reliable as another malware research tool, malwaredomainlist.com, that Bendelladj holds up as accurate. While he claims that the subject IP address appeared on Abuse.ch's list but did not appear on malwaredomainlist.com, the affidavit also recounted that the SpyEye C&C servers in Orlando, Kansas City and New York similarly did not appear on malwaredomainlist.com but were found to be malware.

22

Thus, that the instant IP address did not appear on the other tracking list does not render SpyEye Tracker unreliable.

Fourth, the warrant is not fatal because Abuse.ch's methodology in creating its SpyEye Tracker list is unknown. There is no precedent or authority demanding that the reliability standard of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), be applied to investigative procedures used by law enforcement in order for the search warrant to contain probable cause for the search, nor does *Daubert* hold that this standard must be applied to the probable cause analysis. *United States v. Pirosko*, No. 5:12CR327, 2013 WL 5595224, *3 (N.D. Ohio Oct. 10, 2013). Here the Court has found that the information from Abuse.ch was reliable, and thus the issuing magistrate judge was entitled to rely upon it in his consideration of whether probable cause to search existed. The same holds true for Bendelladj's argument that he cannot recreate Abuse.ch's results, since "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)). The fact that the information cannot be duplicated or recreated does not mean it was not reliable at the time the warrant issued.

23

Similarly, that Bendelladj could not find sufficient information on the entity and person associated with Abuse.ch does not detract from the reliability of Abuse.ch's SpyEye Tracker list as demonstrated in the affidavit for the search warrant. The list is used by law enforcement and private security organizations to detect the SpyEye malware, and in using IP addresses listed on SpyEye Tracker, in addition to other information, the affiant was able to discover SpyEye malware in at least four other IP addresses. That is sufficient to demonstrate reliability.

Thus, the information from Abuse.ch was reliable and, under the totality of circumstances, that the subject IP address was listed on Abuse.ch's SpyEye Tracker list properly contributed to the issuing magistrate judge's conclusion that probable cause existed to issue the warrant.

Finally, the Court takes note of Bendelladj's argument that Exhibit A to the search warrant affidavit shows "no results" for three of the URL searches performed by the affiant. However, it is Bendelladj's burden to show that the warrant was invalid, and the bare statement in his motion about these "no result" entries, given that the same exhibit shows that there was a "hit" for SpyEye malware on the IP address, is not sufficient to undermine the finding of probable cause in this case.

24

Accordingly, the undersigned **RECOMMENDS** that Bendelladj's motion to suppress, [Doc. 108], be **DENIED**.

### 3.    *Conclusion*

For all of the above and foregoing reasons, the undersigned **RECOMMENDS** that Defendant Bendelladj's motions to suppress, [Doc. 108], and to dismiss the indictment, [Doc. 109], be **DENIED**.  The Court has now ruled on all matters referred to it, and has not been informed of any obstacles to the scheduling of a trial.  Therefore, this matter is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the 29th day of December, 2014.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

25